| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: June 19, 2019 4:11 PM<br>FILING ID: 4A9802C4E7DF2<br>CASE NUMBER: 2019CV32398 |
| **Plaintiff:** MARK LASSER, an individual,<br><br>v.<br><br>**Defendant:** CHARTER COMMUNICATIONS, INC., a Delaware corporation and PETER BROWN, an individual. | ▲ **COURT USE ONLY** ▲ |
| Attorneys for Plaintiff:<br>Jason B. Wesoky, Reg. No. 34241<br>D. J. Marcus, Reg. No. 41189<br>Darling Milligan PC<br>1331 17th Street, Suite 800<br>Denver, CO 80202<br>Phone: (303) 623-9133<br>Fax: (303) 623-9129<br>E-mail: jwesoky@darlingmilligan.com<br>dmarcus@darlingmilligan.com | Case No:<br><br>Division: |
| **COMPLAINT** | |

Plaintiff, Mark Lasser, by and through his attorneys Darling Milligan PC, for his complaint against Charter Communications, Inc., a Delaware corporation ("Charter") and Peter Brown ("Brown") Charter and Brown collectively referred to as Defendants, avers as follows:

## GENERAL ALLEGATIONS

1. Mr. Lasser currently resides in King County, Washington, however during his employment with Charter resided in Denver, Colorado.

2. Defendant Charter Communications, Inc., is a Delaware corporation. Its primary business is TV, internet, and voice company provider. At all times pertinent hereto it was an employer of more than 15 employees and conducted business in and throughout the State of Colorado.

3. Defendant Peter Brown is a Colorado resident, a Charter Employee, and is Vice President of Design and Accessibility.

# EXHIBIT A

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this subject pursuant to C.R.S. § 13-1-124 as Charter conducts business within and throughout the State of Colorado.

5. Charter conducts business throughout the State of Colorado, including in Denver, and Mr. Lasser resided in Denver County during his employment with Charter. Venue is therefore proper pursuant to C.R.C.P. 98.

## FACTUAL BACKGROUND

6. Mr. Lasser is disabled because he is medically and legally blind.

7. At all relevant times, Charter knew of Mr. Lasser's disability.

8. Mr. Lasser was employed by Charter starting on March 13, 2017 and served as Senior Director, Accessibility.

9. Mr. Lasser reported directly to Peter Brown Vice President of Design and Accessibility.

10. Mr. Lasser's job was to improve Charter's accessibility for disabled customers and employees as required by applicable laws and regulations in Charter's various markets.

11. Mr. Lasser earned recognition with the 2017 Shining Star Executive Director's Award for Outstanding Service from the Colorado Department of Labor for his work championing the rights of people with disabilities. On November 16, 2017, Mr. Lasser received a letter from Governor John Hickenlooper congratulating and thanking Mr. Lasser.

12. As part of Mr. Lasser's work improving accessibility for Charter's employees, he requested several disability accommodations for himself and other disabled employees.

13. During his employment with Charter, Mr. Lasser requested, among other accommodations, an accommodation for his disability in the form of a screen reader program for computers, known as JAWS (Job Access With Speech), to allow him to use computing tools including Microsoft Windows and Office. JAWS is a screen reader that provides speech output for computers using the Microsoft Windows operating system.

14. The cost for the JAWS program was approximately $1,200 for an initial professional license. Required annual updates referred to as Service Maintenance Agreements (SMA) are approximately $200/year.

15. Mr. Lasser also requested a license for the Kurzweil program and scanner that scans documents and reads them aloud; it also provides text-to-speech for electronic documents and text – it is an adaptive technology for the blind.

16. The cost for the Kurzweil program and scanner was approximately $1,000.

17. Charter either never provided these accommodations or failed to provide them effectively.

18. In the case of JAWS, Charter provided a "free mode" version of the program that required restarting the computer every 40 minutes. This version is not licensed for use in a work environment and is only meant for purposes of evaluation. Rather than purchase a new license for Mr. Lasser, as required by the software manufacturer, Charter installed a copy of JAWS already licensed to another employee. The software could not be updated because it was not a compliant and licensed version. Charter instructed Mr. Lasser to use the "free mode" version again while it directed Mr. Laser to again request a complaint and licensed version of JAWS through an application that was itself non-accessible.

19. Mr. Lasser also requested Charter make many of the software, and other programs used by disabled and non-disabled employees of Charter accessible, including a timecard program (Kronos), an expense reporting and travel booking program (Concur), and a health and benefits tool (My Benefits). Alternatively, Mr. Lasser asked for an accommodation – if making the programs accessible was not possible – by having someone assist him with the programs.

20. Despite Mr. Lasser's requests, Charter did not make any of these tools accessible to disabled employees or to Mr. Lasser or provide the assistance requested.

21. Because Charter did not make Concur accessible or provide assistance, Mr. Lasser was unable to approve travel and expense reports, bonuses, and salaries for his direct reports. Instead, Charter directed Mr. Lasser to have his direct reports provide assistance, which would result in them accessing sensitive financial information for other employees.

22. During Mr. Lasser's orientation with Charter, he was offered a map showing the evacuation point and procedure if there was a fire in the building.

23. Mr. Lasser could not read the map and requested a tactile map for both himself and other blind employees. Mr. Lasser even provided information about how Charter could get a tactile map.

24. Rather than get tactile maps, Charter instituted a "buddy-system"—not for all employees, but only for disabled employees. Besides singling out disabled employees in front of their peers, Charter's buddy-system provided no fallback for disabled employees if their buddies were out of the office at the time of a fire.

25. Mr. Lasser also requested that Charter's "Simplicity" tool for email retention be made accessible. The Simplicity tool required employees to drag and drop email to be saved onto their laptop hard drives. Blind employees such as Mr. Lasser have difficulty performing drag and drop functions. Without an accessible program, Mr. Lasser was unable to save many emails because Charter would periodically delete emails.

26. Instead of making Simplicity accessible, Charter side provided blind employees with more email storage. Charter only provided the additional email storage after Mr. Lasser mentioned that the ADA required accommodation efforts.

27. Mr. Lasser, like most managers at Charter, was required to use a tool called "Mission Control" for budgeting for interdepartmental projects and logistics for contractors. Mission Control was not accessible, and Mr. Lasser requested an accommodation to allow him to use it, including, for example, writing a script for use with the JAWS screen reader program, or modifying the software to be accessible. Instead, Charter just ordered Mr. Lasser's direct report to do this work for Mr. Lasser.

28. Mr. Lasser mentioned that the ADA might require making such tools accessible in a conversation with Mr. Brown. Mr. Lasser was told to never mention words such as "compliance", "ADA violations", or "resistance to accommodate disabilities", or he would be written up.

29. Charter did not use commonly used software Adobe to PDF documents. The result was inaccessible documents for Charter's employees and customers. Mr. Lasser attempted to find solutions to make internal documents accessible with Adobe, however Charter would not allow this for security reasons. Again, Charter's solution was for Mr. Lasser's direct report read the PDF documents to him.

30. Even though Mr. Lasser was in charge of Charter's accessibility efforts he was told that this was "crossing a swim lane" and to cease his efforts. However, Mr. Brown directed Mr. Lasser that this was his job to accomplish this task.

31. Mr. Lasser tried to improve Charter's accessibility for disabled customers—as he was supposed to do in his position—most importantly by working

4

to make sure Charter complied with applicable law including the 21st Century Communications and Video Accessibility Act (CVAA).

32. CVAA required Charter to create accessible platforms, including text-to-speech program guides, easy access to audio descriptions, secondary programming, and pass through of Emergency Broadcast Signal to television and WiFi connected devices used to watch content in the home.

33. After learning that those at Charter whom were tasked with designing and developing products and services were unaware of the requirements under the CVAA, including for accessibility of mobile applications, Mr. Lasser suggested creating a learning module with a knowledge test.

34. Charter's legal team objected because, they explained to Mr. Lasser, Charter and the people at Charter responsible for product development, specifically Mr. Brown's department, would then open themselves to lawsuits because they would be acknowledging their prior failure to comply with the CVAA.

35. One of the accessibility problems Mr. Lasser identified was that mobile applications were not passing through Emergency Broadcast System warnings over the "Secondary Audio Program," which is necessary for blind customers to access such warnings. This presented a safety issue.

36. When Charter acquired Time Warner Cable in California, Charter agreed to ensure its products in California were accessible, that field operations and customer care would be trained in accessibility, and that provisions would be made to accommodate customers with mobility issues. Charter did not fulfill this agreement and many of its California products were not accessible to disabled California customers.

37. Charter and Mr. Brown directed Mr. Lasser to communicate with the California Public Utilities Commission ("PUC") in order to obtain extensions and avoid fines for noncompliance and instructed Mr. Lasser to make arbitrary distinctions and provide assurances that deadlines would be met (when in fact Charter knew they could not be met).

38. Charter directed Mr. Lasser to make similar representations to Citizens for Assistive Technology, the organization the California PUC tasked with verifying that accessibility concerns were addressed.

39. Additionally, Citizens for Assistive Technology required Charter to create and provide training modules for Charter employees to appropriately interact with disabled customers. The training tools used by Charter were not accessible, thus preventing disabled employees from doing the training.

40. Mr. Lasser worked with two teams, the Field Operations team and Customer Care team, to create those modules. The Customer Care team created a training module that was not accessible.

41. When Mr. Lasser raised this issue, he was told Charter had no disabled employees in California and if it hired one, the training could be remediated at that point. He was told this even though such remediation would cost much more than creating an accessible module in the first place and was directly contrary to Citizens for Assistive Technology's direction.

42. Charter directed Mr. Lasser to "get on board" with the Customer Care team's training module, even though Mr. Lasser could not himself review it since it was not accessible.

43. Charter attempted to meet CVAA mandates with Android tablets, HP laptops, and Roku devices. Though cheap and intended to meet the technical requirements of the CVAA, these devises were not easily accessible, which Charter knew because Mr. Lasser specifically informed it of that fact.

44. Charter and Mr. Brown directed Mr. Lasser to convey to the FCC certain deadlines Charter would meet regarding these inaccessible devices, and information regarding its compliance with the CVAA, which Mr. Lasser knew to be false.

45. In November of 2017, Mr. Lasser suggested to Charter's Government Affairs team that Charter correct the false information it provided to the FCC, Charter reprimanded Mr. Lasser and instructed him to have no further communications with the FCC.

46. On or about November 9, 2017, Charter placed Mr. Lasser on administrative leave. Charter did not explain why.

47. On December 18, 2017, Charter gave Mr. Lasser the choice to resign or be terminated. Its purported reason for forcing Mr. Lasser out was that Charter "decided it needed to part ways" with Mr. Lasser.

48. Charter's representatives stated that Mr. Lasser's behavior "was not acceptable" and he was "not working well with his team," though no one conveyed to Mr. Lasser any way in which his behavior was unacceptable or any way in which he was not working well with his team.

49. Charter's failure to accommodate Mr. Lasser, its refusal to implement accessible programs for Mr. Lasser and other disabled persons, its directives to have Mr. Lasser provide incorrect information to regulatory authorities and then

6

reprimanding Mr. Lasser for either not doing so or trying to provide correct information created a work environment that a reasonable person would feel no choice but to leave.

50. Charter's failure to accommodate Mr. Lasser's disability constitutes discrimination under the Americans with Disabilities Act, as amended.

51. Charter's termination/forced resignation/constructive discharge, violated the Americans With Disabilities Act, as amended, the Rehabilitation Act, and the Colorado Anti-Discrimination Act.

52. Charter's treatment of and discrimination against Mr. Lasser was in retaliation for Mr. Lasser's efforts to get Charter to comply in good faith with applicable law regarding accessibility, giving rise to a common law retaliatory wrongful termination in violation of public policy claim.

53. Mr. Lasser timely brought a charge of discrimination with the Colorado Civil Rights Division on the grounds of disability discrimination, and wrongful discharge in violation of public policy. The Colorado Civil Rights Division ("CCRD") investigated the matter.

54. On March 18, 2019 the CCRD issued to Mr. Lasser and Charter a Letter of Determination finding reasonable cause to believe to that Defendant had violated C.R.S. § 24-34-402, as re-enacted, with respect to Mr. Lasser's claims of refusal to grant a reasonable accommodation related to his disability and retaliation.

55. Additionally, Mr. Lasser and Charter were ordered by the CCRD to proceed to attempt amicable resolution of those claims by informal methods of conciliation.

56. On April 30, 2019, the CCRD issued a Notice of Failure of Conciliation, and May 28, 2019 issued a Notice of Right to Sue.

### First Claim for Relief
**(Discrimination under C.R.S. § 24-34-402 - Charter)**

57. Plaintiff incorporates all prior allegations as if fully set forth herein.

58. The foregoing acts and omissions of Charter violate the provisions of Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402, et seq.

59. Plaintiff is disabled and in a protected class based on his disability (blindness).

60. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without accommodations and was able to perform the essential functions of his job.

61. Charter discriminated against Mr. Lasser because Charter terminated/forced Mr. Lasser to resign/constructively discharged Mr. Lasser.

62. The circumstances surrounding the termination/forced resignation/constructive discharge demonstrate Charter's discrimination because it did not terminate or otherwise discipline/discharge non-disabled employees similarly situated to Mr. Lasser.

63. In fact, following Charter's termination of Mr. Lasser, Charter terminated several other disabled contractors, and with very few exceptions has hired only non-disabled individuals to replace them and Charter has not similarly treated non-disabled employees.

64. Thus, Charter engaged in discrimination because of Mr. Lasser's disability (blindness).

65. The discrimination includes the treatment of Mr. Lasser that differed from his non-disabled counterparts, including, but not limited to, failure to accommodate Mr. Lasser's disability, termination/forced resignation/constructive discharge, and disparate treatment.

66. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

## Second Claim for Relief
**(Discrimination under C.R.S. § 24-34-402(1)(e) – Peter Brown)**

67. Plaintiff incorporates all prior allegations as if fully set forth herein.

68. The foregoing acts and omissions of Peter Brown violate the provisions of Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402(1)(e).

69. Plaintiff is disabled and in a protected class based on his disability (blindness).

70. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without accommodations and was able to perform the essential functions of his job.

71. Mr. Lasser reported directly to Mr. Brown Vice President of Design and Accessibility.

72. Mr. Brown violated C.R.S. § 24-34-402(1)(e) when he, as alleged above, aided, abetted, compelled, or coerced discriminatory acts against Mr. Lasser; obstructed or prevented Mr. Lasser from complying with anti-discrimination laws; and/or attempted, directly or indirectly, to commit discriminatory acts.

73. The circumstances surrounding the termination/forced resignation/constructive discharge of Mr. Lasser further demonstrate discrimination committed by Mr. Brown.

74. Following Mr. Lasser's termination, several other disabled contractors in Mr. Brown's department were terminated, and with very few exceptions hired only non-disabled individuals to replace them and Mr. Brown has not similarly treated non-disabled employees.

75. Thus, Mr. Brown engaged in discrimination because of Mr. Lasser's disability (blindness).

76. The discrimination includes the treatment of Mr. Lasser that differed from his non-disabled counterparts, including, but not limited to, failure to accommodate Mr. Lasser's disability, termination/forced resignation/constructive discharge, and disparate treatment.

77. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

### Third Claim for Relief
**(Discrimination under 42 U.S.C. §§ 12102(1)(A) and 12102(2)(A) - Charter)**

78. Plaintiff incorporates all prior allegations as if fully set forth herein.

79. The foregoing acts and omissions of Charter violate the provisions of the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12102(1)(A) and 12102(2)(A).

80. Plaintiff is disabled and in a protected class based on his disability (blindness).

81. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without reasonable accommodations.

9

82. Charter discriminated against Mr. Lasser because Charter terminated/forced Mr. Lasser to resign/constructively discharged Mr. Lasser.

83. The circumstances surrounding the termination/ forced resignation/ constructive discharge demonstrate Charter's discrimination because it did not terminate or otherwise discipline/discharge non-disabled employees similarly situated to Mr. Lasser.

84. In fact, following Charter's termination of Mr. Lasser, Charter terminated several other disabled contractors, and with very few exceptions has hired only non-disabled individuals to replace them.

85. Thus, Charter engaged in discrimination because of Mr. Lasser's disability (blindness).

86. The discrimination includes the treatment of Mr. Lasser that differed from his non-disabled counterparts, including, but not limited to, failure to accommodate Mr. Lasser's disability, termination/forced resignation/constructive discharge, and disparate treatment.

87. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

### Fourth Claim for Relief
### (Discrimination under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 – Charter)

88. Plaintiff incorporates all prior allegations as if fully set forth herein.

89. The foregoing acts and omissions of Charter violate the provisions Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

90. Plaintiff is disabled and in a protected class based on his disability (blindness).

91. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without reasonable accommodations.

92. Charter discriminated against Mr. Lasser because Charter terminated/forced Mr. Lasser to resign/constructive discharged Mr. Lasser.

93. The circumstances surrounding the termination/forced resignation/constructive discharge demonstrate Charter's discrimination because it

did not terminate or otherwise discipline/discharge non-disabled employees similarly situated to Mr. Lasser.

94. In fact, following Charter's termination of Mr. Lasser, Charter terminated several other disabled contractors, and with very few exceptions has hired only non-disabled individuals to replace them.

95. Thus, Charter engaged in discrimination because of Mr. Lasser's disability (blindness).

96. The discrimination includes the treatment of Mr. Lasser that differed from his non-disabled counterparts, including, but not limited to, failure to accommodate Mr. Lasser's disability, termination/forced resignation/constructive discharge, and disparate treatment.

97. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

## Fifth Claim for Relief
### (Violation of the Americans with Disabilities Act, as amended, 42 U.S.C.§§ 12111(9) and 12112(a) – Charter)

98. Plaintiff incorporates all prior allegations as if fully set forth herein.

99. The foregoing acts and omissions of Charter violate the provisions of the Americans with Disabilities Act, as amended, 42 U.S.C.§§ 12111(9) and 12112(a).

100. Mr. Lasser is disabled as defined under 42 U.S.C. §§ 12102(1)(A) and 12102(2)(A), as Charter had always known Ms. Lasser is medically and legally blind.

101. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without reasonable accommodations.

102. Mr. Lasser requested various reasonable accommodations to perform the essential functions of his position and to enjoy equal benefits of employment as non-disabled employees, such as computer software designed to allow for use by persons with substantially limited visual impairments; braille formatting software; and an accommodation to allow him to evacuate the building safely in the event of an emergency.

103. Charter failed to provide Mr. Lasser any of the requested accommodations, did not participate in an interactive process with Mr. Lasser, and simply denied his accommodation requests without explanation or reason.

11

104. The failure to accommodate constitutes discrimination under the ADA.

105. Plaintiff is entitled to all damages and remedies including, but not limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

## Sixth Claim for Relief
### (Violation of Section 504 Rehabilitation Act, 29 U.S.C. § 794 – Charter)

106. Plaintiff incorporates all prior allegations as if fully set forth herein.

107. The foregoing acts and omissions of Charter violate the provisions of the Section 504 Rehabilitation Act, 29 U.S.C. § 794.

108. Mr. Lasser is disabled as defined under 42 U.S.C. §§ 12102(1)(A) and 12102(2)(A), as Charter had always known Ms. Lasser is medically and legally blind.

109. Mr. Lasser was qualified for his job as a Senior Director, Accessibility, with or without reasonable accommodation.

110. Mr. Lasser requested various reasonable accommodations to perform the essential functions of his position, such as computer software designed to allow for use by persons with substantially limited visual impairments with respect to certain programs; braille formatting software; and an accommodation to allow him to evacuate the building safely in the event of an emergency.

111. Charter failed to provide Mr. Lasser any of the requested accommodation, nor did Charter participant in an interactive process with Mr. Lasser, Charter simply denied his accommodation requests without explanation or reason.

112. By Charter failing to accommodate Mr. Lasser it made it difficult for Mr. Lasser to complete functions of position and violated the Rehabilitation Act.

113. Plaintiff is entitled to all damages and remedies including, but no limited to back pay, front pay, reinstatement, attorney fees and costs.

## Seventh Claim for Relief
### (Wrongful Discharge and Retaliation in Violation of Public Policy - Charter)

114. Plaintiff incorporates all prior allegations as if fully set forth herein.

115. During Mr. Lasser's employment, Charter directed him to make false statements to regulators and endorse programs that were not in compliance with regulations under the CVAA.

116. Mr. Lasser refused to comply with or objected to Charter's directives, including endorsing Charter's training modules as the documents were not accessible.

117. Further, Mr. Lasser requested various reasonable accommodations to perform the essential functions of his position, such as computer software designed to allow for use by persons with substantially limited visual impairments with respect to certain programs; braille formatting software; and an accommodation to allow him to evacuate the building safely in the event of an emergency.

118. Charter terminated/forced Mr. Lasser to resign/constructively discharged Mr. Lasser when he pushed Charter to comply with applicable law regarding disabilities, including the ADA and CVAA, including his refusal to make false statements to regulators and unwillingness to endorse Charter's training modules, and when he requested accommodations.

119. Charter's termination/forced resignation/constructive discharge of Plaintiff violated the law and public policy and was a wrongful discharge of Mr. Lasser.

120. Plaintiff is entitled to all damages and remedies including, but no limited to back pay, front pay, reinstatement, attorney fees as permitted by statute, punitive damages as permitted by statute, and costs.

WHEREFORE, Plaintiff seeks judgment in his favor and against Defendants' for monetary damages in an amount to be determined by a jury and the Court for all damages compensable under the foregoing claims, for all equitable remedies available under said claims, including: back pay (including interest and benefits); compensation for damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof; exemplary and punitive damages in accordance with applicable law (including 42 U.S.C. § 1981) in an amount commensurate with Defendants' ability to pay and to deter future conduct; costs incurred, including reasonable attorneys' fees to the extent allowable by law (including 42 U.S.C. §2000e-5); pre-judgment and post-judgment interest, as provided by law; and such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**Plaintiff demands trial by a jury on all issues so triable.**

Dated this 19th day of June 2019.

DARLING MILLIGAN PC

*/s/ Jason B. Wesoky*
Jason B. Wesoky, Reg. No. 34241
D. J. Marcus, Reg. No. 41189
*Attorneys for Plaintiff*

Plaintiff's Address:
520 Occidental Ave. S., #818
Seattle, WA 98104

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: June 19, 2019 4:11 PM<br>FILING ID: 4A9802C4E7DF2<br>CASE NUMBER: 2019CV32398 |
| **Plaintiff:** MARK LASSER, an individual,<br><br>v.<br><br>**Defendant:** CHARTER COMMUNICATIONS, INC., a Delaware corporation and PETER BROWN, an individual. | ▲ **COURT USE ONLY** ▲ |
| Attorneys for Plaintiff:<br>Jason B. Wesoky, Reg. No. 34241<br>D. J. Marcus, Reg. No. 41189<br>DARLING MILLIGAN PC<br>1331 17th Street, Suite 800<br>Denver, CO 80202<br>Phone:     (303) 623-9133<br>Fax:          (303) 623-9129<br>E-mail:     jwesoky@darlingmilligan.com<br>                  dmarcus@darlingmilligan.com | Case No:<br><br>Division: |
| **DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD-PARTY COMPLAINT AND JURY DEMAND** | |

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross- claim or third-party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

    ☐ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

    ☒ This party is seeking a monetary judgment against another party for more than $100,000.00, including any penalties or punitive damages, but excluding attorney fees, interest and costs, as supported by the following certification:

1

> By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000."

☐ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3.  ☒ This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38.

Dated: June 19, 2019

*/s/Jason B. Wesoky*
Jason B. Wesoky, Reg. No. 34241
D. J. Marcus, Reg. No. 41189
*Attorney for Plaintiff*

2